**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JOANNE V. ROMONOSKY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 12-1153 |
| v. | ) | |
| | ) | Judge Nora Barry Fischer |
| CAROLYN W. COLVIN, | ) | Magistrate Judge Lisa Pupo Lenihan |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

## I. RECOMMENDATION

It is respectfully recommended that the Court deny Plaintiff's Motion for Summary Judgment, grant Defendant's Motion for Summary Judgment, and affirm the decision of the administrative law judge ("ALJ").

## II. REPORT

### A.    BACKGROUND

#### 1. Procedural

Joanne V. Romonosky ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 – 433, 1381 – 1383f ("Act").  Plaintiff filed for benefits claiming an inability to

work due to disability beginning January 22, 2009.  (R. at 125 – 35).[1]  At the time of her application for benefits, Plaintiff's allegedly disabling impairments included hepatitis C, depression, panic attacks, and HIV, and resulted in persistent pain, fatigue, and sickness.  (R. at 191).  Despite her claims, Plaintiff was denied benefits under the Act.  (R. at 1 – 5, 12 – 31, 95 – 401).  Having exhausted all administrative remedies, this matter now comes before the Court on cross motions for summary judgment.  (ECF Nos. 10, 12).

## 2. General

Plaintiff was born on January 4, 1964, was forty five years of age at the time of her application for benefits, and was forty six years of age at the time of her administrative hearing.  (R. at 35).  Plaintiff lived independently in an apartment.  (R. at 36).  She was separated from her husband, and had two adult children.  (R. at 36, 42).  Plaintiff completed her high school education, but did not pursue post-secondary or vocational education.  (R. at 36).  Plaintiff's past relevant work history included employment as an assistant manager at a fast food restaurant, as a manager at a thrift store, and as a residential advisor at a residential mental health rehabilitation center.  (R. at 52, 201).  Plaintiff ceased full time work in January 2009.  (R. at 201).  Plaintiff worked again from March 2009 until May 2009; however, this did not amount to substantial gainful activity.  (R. at 200).  Plaintiff has since subsisted on cash assistance and food stamps.  (R. at 41).  She receives medical benefits from the state.  (R. at 41).

## 3. Treatment History

On January 17, 2008, Plaintiff was examined by her primary care physician Joanna R. Swauger, D.O. for the purpose of applying for a job assisting the mentally retarded at home and school.  (R. at 505).  Plaintiff reported that she was generally in good health.  (R. at 505).  She did claim that she experienced abdominal pain, but not diarrhea, nausea, or vomiting.  (R. at

---

[1]      Citations to ECF Nos. 5 – 5-15, the Record, *hereinafter*, "R. at __."

505).  She noted back pain and stiffness, but denied difficulty with walking.  (R. at 505).  She further denied experiencing dizziness, headaches, numbness, and tingling.  (R. at 505).

Dr. Swauger indicated that Plaintiff had past diagnoses of basal cell cancer, depression, disc disease, hypertension, and hepatitis C.  (R. at 505).  While she had received treatment and medication for depression and anxiety in the past, she no longer received such care.  (R. at 505).  Inspection of Plaintiff's abdomen revealed mild tenderness in the upper right quadrant, but no notable abnormalities.  (R. at 506).  Plaintiff was considered to be healthy and well developed.  (R. at 505).  Plaintiff was advised to seek treatment for her hepatitis C.  (R. at 506).  She was also cautioned about her use of pain medications for her pain due to a history of narcotic addiction.  (R. at 506).

On September 27, 2008, Plaintiff presented at the emergency department of Monongahela Valley Hospital in Monongahela, Pennsylvania, complaining of sharp, stabbing pain in her right upper abdomen.  (R. at 348).  She had been seen at the hospital two days earlier for similar pain.  (R. at 348).  She was provided with Percocet.  (R. at 349, 352).  Her pain improved and she refused further treatment or admission to the hospital.  (R. at 349).  Acalculous cholecystitis was suspected.  (R. at 349).  Plaintiff was told to follow up with Dr. Swauger, and did so.  (R. at 351, 509 – 10).  Testing conducted at the hospital between September 25 and 28 demonstrated possible acalculous cholecystitis.  (R. at 392).  Acute cholecystitis was ruled out.  (R. at 397).  Fatty infiltration of the liver was also noted.  (R. at 392).  No other significantly abnormal findings were noted.  (R. at 392).

On December 23, 2008, Plaintiff returned to Dr. Swauger.  (R. at 527).  She had stopped taking all prescription medications, including those for pain, and was experiencing increased anxiety.  (R. at 527).  Without her medications, therapy had not been helpful.  (R. at 527).

Plaintiff informed Dr. Swauger that she needed to take some time away from work. (R. at 527). Plaintiff also reported body aches and fatigue, and stated that her general health was only fair. (R. at 527). There was ongoing abdominal pain, but not nausea or vomiting. (R. at 527). Dr. Swauger observed Plaintiff to appear healthy and well developed. (R. at 528). There was no notable abnormality upon inspection of Plaintiff's abdomen. (R. at 528). Plaintiff appeared comfortable and was cooperative during the examination. (R. at 528). She did seem to be anxious, however. (R. at 528). Plaintiff was placed on Seroquel until her next meeting with a psychiatrist. (R. at 528).

On May 11, 2009, Plaintiff again appeared at the Monongahela Valley Hospital emergency department complaining of abdominal pain, nausea, vomiting, diarrhea, weakness, and fatigue for approximately two weeks. (R. at 362). Plaintiff was examined by Dr. Swauger, and was noted to have past diagnoses of chronic back and upper right quadrant pain, narcotic addiction, and hepatitis C. (R. at 367). At that time, Plaintiff's hepatitis C had not required any treatment. (R. at 367). Plaintiff reported to Dr. Swauger that she had sought treatment with a psychiatrist for depression over the past year, but ceased treatment and use of prescription medication because of allegedly worsening symptoms. (R. at 367). Over the past several months, Plaintiff complained of fatigue so severe that she quit working. (R. at 367). Her upper right quadrant pain had become unbearable. (R. at 367). Plaintiff also feared the possibility of having contracted HIV from her husband. (R. at 367).

Dr. Swauger noted that Plaintiff did not complain of lower extremity pain, swelling, numbness, tingling, or parathesias. (R. at 367). Plaintiff denied focal joint pain. (R. at 368). Neurologically, Plaintiff was grossly intact and without any deficits. (R. at 368). She exhibited mild right upper quadrant tenderness upon physical inspection, and her liver was moderately

enlarged. (R. at 368). Plaintiff was alert and oriented, but appeared anxious and irritable. (R. at 368). She denied feeling depressed and did not wish to be treated for depression. (R. at 368). Dr. Swauger believed Plaintiff to be bipolar. (R. at 369). Plaintiff was to undergo additional testing for hepatitis C and HIV. (R. at 369). She was advised to see a new specialist for hepatitis treatment. (R. at 369). A CT scan of the abdomen was relatively unremarkable. (R. at 377, 551).

On May 18, 2009, Plaintiff returned to Dr. Swauger's practice for a follow-up after her hospitalization. (R. at 543). Plaintiff had no new complaints and was taking her medications as prescribed. (R. at 543). Plaintiff claimed that she could not engage in any activity without pain, and that she was very tired. (R. at 543). She continued to experience increase pain in her upper right quadrant, but not diarrhea or vomiting. (R. at 543). Plaintiff believed her general health to be poor. (R. at 543). She denied dizziness, headaches, numbness, tingling, and weakness. (R. at 543).

Dr. Swauger opined that Plaintiff appeared older than her stated age and was chronically ill. (R. at 543). Upon examination, however, no tenderness or other abnormality was found in the abdomen. (R. at 544). Although anxious, Plaintiff appeared comfortable and was cooperative during the examination. (R. at 544). Plaintiff was provided with a limited prescription for Percocet for her pain. (R. at 544). She was ordered to have lab work completed for monitoring of her hepatitis C and HIV. (R. at 544).

On June 12, 2009, Hossam Kandil, M.D., Ph.D. completed a consultative examination of Plaintiff for purposes of treating her hepatitis C. (R. at 554 – 59). In his narrative report, Dr. Kandil indicated that Plaintiff reported chronic abdominal pain for two years prior to her examination. (R. at 555). She also complained of fatigue and lack of energy, and tearfully

described her life as "miserable." (R. at 555). Dr. Kandil noted that CT scans, abdominal ultrasound, hepatobiliary scan, colonoscopy, and esophagogastroduodenoscopy had failed to produce a cause for Plaintiff's pain. (R. at 555). Plaintiff denied significant diarrhea and constipation, as well as nausea and vomiting. (R. at 555).

Upon examination, Dr. Kandil did not observe Plaintiff to be in acute distress. (R. at 555). Mild tenderness was detected in the upper right quadrant. (R. at 555). Dr. Kandil believed Plaintiff to be depressed, and recommended that she seek treatment for this issue due to potential exacerbation of depression during treatment for hepatitis C. (R. at 555). Plaintiff's abdominal pain was considered to have a questionable etiology in light of extensive work-ups in the past which revealed no definitive causes. (R. at 555). Dr. Kandil suggested increasing Plaintiff's intake of fiber, as her condition may be irritable bowel syndrome. (R. at 555).

Plaintiff also began to see Deborah K. McMahon, M.D. on June 12, 2009. (R. at 585). Plaintiff's diagnosis of hepatitis C was noted, as was a diagnosis of HIV infection. (R. at 585). Plaintiff was indicated to have a history of panic attacks, as well. (R. at 587). It was believed that she may have received hepatitis from her husband, but the source of her HIV infection was uncertain. (R. at 585). Plaintiff was not taking any medications at the time. (R. at 587). Upon examination, Plaintiff did have some abdominal pain. (R. at 586). Plaintiff also had some back pain, but was neurologically unremarkable. (R. at 586). Plaintiff had a normal gait and normal strength. (R. at 587).

Plaintiff returned to Dr. McMahon in July 2009. (R. at 592). Plaintiff was to begin treatment for her hepatitis C in a few months. (R. at 592). Plaintiff stated that her mood was "great." (R. at 592). Dr. McMahon observed no distress, no abdominal tenderness, and no

neurological deficits. (R. at 592 – 93). Plaintiff complained of some pain in her knee, and was advised to use Motrin, as needed. (R. at 593).

Plaintiff was seen again by Dr. McMahon in September 2009, and reported experiencing pain in her knees and panic attacks. (R. at 598 – 99). Upon examination, she was noted to appear in no acute distress, she had no abdominal tenderness, and she had normal gait and strength. (R. at 599). Plaintiff was anxious and tearful, however. (R. at 599).

At a follow-up appointment with Dr. McMahon on October 16, 2009, Plaintiff expressed that she was under a significant amount of stress due to the lack of a stable home, turmoil with her husband, and a pending divorce, as well as her hepatitis C and HIV diagnoses. (R. at 603). As a result of this duress, Plaintiff claimed to be experiencing migraine headaches. (R. at 603). The migraines were accompanied by light sensitivity and vomiting. (R. at 603). She stated that the migraines occurred once or twice per week. (R. at 603). Upon examination, Dr. McMahon found Plaintiff to be alert, oriented, and in no acute distress. (R. at 604). Plaintiff was depressed, anxious, and tearful. (R. at 604). Plaintiff's abdomen was non-tender, she exhibited a normal gait, and had normal strength. (R. at 604). Plaintiff was referred for counseling. (R. at 605). Plaintiff was prescribed Sumatriptan Succinate for her headaches and Citalopram for her depression. (R. at 605).

On March 31, 2010, Plaintiff was again examined by Dr. McMahon. (R. at 632). Plaintiff had not yet begun treatment for hepatitis C or HIV. (R. at 632). Plaintiff was feeling "a bit better" taking an antidepressant, but still felt overwhelmed. (R. at 632). Plaintiff complained of knee pain, knee swelling, and difficulty walking. (R. at 632). Dr. McMahon observed Plaintiff to be alert and oriented, but somewhat anxious. (R. at 633). Plaintiff's right upper quadrant was mildly tender. (R. at 633). She exhibited a normal gait and normal strength. (R. at

633). Dr. McMahon felt that Plaintiff was functionally limited by joint pain, stress, and anxiety. (R. at 633). Dr. McMahon continued to prescribe Citalopram and Sumatriptan Succinate. (R. at 634). An x-ray of Plaintiff's knee revealed mild medial and minimal patellofemoral compartment osteophytosis, and moderate joint effusion. (R. at 635).

Plaintiff was examined by William C. Anderson, M.D. on July 28, 2010. (R. at 625). Plaintiff's diagnoses of hepatitis C, HIV, anxiety, and depression were noted. (R. at 625). Plaintiff also complained of migraine headaches three or four times per week, diffuse body aches, hot flashes, and significant fatigue. (R. at 625). Plaintiff stated that her anxiety attacks and depression had improved with medication and counseling. (R. at 625). Dr. Anderson observed Plaintiff to be alert, oriented, and in no acute distress. (R. at 625). Her mood was appropriate, her upper right quadrant was mildly tender, and her gait and strength were normal. (R. at 625).

On July 29, 2010, Plaintiff returned to see Dr. McMahon. Plaintiff continued to complain of multiple life stressors, poor sleep, fatigue, and back and knee pain. (R. at 624). Plaintiff stated that therapy and medication had been "somewhat helpful" with treating her anxiety and depression. (R. at 624). Plaintiff was advised to pursue follow-up care for her hepatitis C, as she had not done so for a significant period of time. (R. at 624). Plaintiff was continued on her medications. (R. at 624). She exhibited mild right upper quadrant tenderness. (R. at 624).

### 4. Functional Capacity Evaluations

On May 27, 2009, Dr. Swauger completed a Pennsylvania Department of Public Welfare Employability Assessment Form indicating that Plaintiff was permanently disabled as a result of hepatitis C, HIV, depression, and chronic pain. (R. at 619 – 620). No narrative statement was provided. No medical findings supporting the disability finding accompanied the form.

On September 23, 2009, Lanny Detore, Ed.D. conducted a Psychological Evaluation of Plaintiff on behalf of the Bureau of Disability Determination. (R. at 560 – 66). Plaintiff informed Dr. Detore that she was seeking disability benefits because her life had begun to "fall apart" in December 2008. (R. at 560). She described experiencing panic, depression, suicidal ideation, struggles with addiction to opioids and alcohol, and emotional issues secondary to separation from her husband. (R. at 560). She also stated that she had been diagnosed with both hepatitis C and HIV – possibly transmitted from her husband. (R. at 560). At the time of the evaluation, Plaintiff was not taking any medications. (R. at 561). Plaintiff had been clean and sober since January 2009, and had been treated with Suboxone in July 2009 to counteract opioid cravings. (R. at 561). Plaintiff did not have an extensive outpatient mental health treatment history. (R. at 561). She had attended therapy on three occasions in December 2008 and January 2009 for panic attacks and suicidal ideation, but discontinued treatment. (R. at 561). Plaintiff had last worked in January 2009, but was terminated due to testing positive for marijuana use. (R. at 562). Plaintiff could independently manage activities of daily living, but was hampered to some extent by fatigue. (R. at 562). Plaintiff spent most of her day indoors, watching television or using the computer. (R. at 562).

Dr. Detore observed that Plaintiff arrived promptly and independently. (R. at 560). She was tearful when describing her problems, but was otherwise pleasant and cooperative. (R. at 562 – 63). Plaintiff's thought processes were rational, coherent, and goal-oriented. (R. at 563). Plaintiff's speech was relevant and coherent, and normal in pace and tone. (R. at 563). Her depression appeared to be moderate in nature. (R. at 563). Plaintiff's intellectual functioning was average, she could perform simple mathematics, she had intact abstract thinking, she had intact memory, her judgment was intact, and her insight was fair-to-good. (R. at 563). Plaintiff

was diagnosed with opioid dependence, in remission, mood disorder, NOS, of moderate severity, major depression, and anxiety disorder of moderate severity and with occasional panic. (R. at 564). Dr. Detore opined that Plaintiff was capable of managing her funds competently, and she was capable of cooking, cleaning, and personal care; however, she had some difficulty with concentration and persistence due to depression and anxiety. (R. at 564). Plaintiff would experience moderate limitations with respect to carrying out detailed instructions, making judgments on simple work-related decisions, responding appropriately to work pressures in a usual work setting, and responding to changes in a routine work setting. (R. at 565). She was otherwise not significantly limited. (R. at 565).

On October 9, 2009, state agency evaluator Sharon Becker Tarter, Ph.D. completed a Mental Residual Functional Capacity Assessment ("RFC") of Plaintiff. (R. at 567 – 70). Based upon her review of the medical record, Dr. Tarter concluded that the evidence supported finding impairment in the way of affective disorders, anxiety-related disorders, and substance addiction disorders. (R. at 567). As a result, Plaintiff would experience moderate limitation with respect to carrying out detailed instructions, performing activities within a schedule, maintaining regular attendance, being punctual within customary tolerances, accepting instructions and responding to criticism from supervisors, and responding appropriately to changes in the work setting. (R. at 567 – 68). Nonetheless, Plaintiff was believed to be capable of full-time work. (R. at 569). In spite of her mental health issues, Plaintiff had not been hospitalized, took no medication, and sought very limited therapy. (R. at 569). Based upon the findings of Dr. Detore, it was believed that Plaintiff would be capable of completing a normal work week without exacerbation of psychological symptoms. (R. at 569). Additionally, Plaintiff could sustain an ordinary routine

and adapt to changes, she could understand and remember instructions, she could concentrate, and she could interact with others. (R. at 569).

On November 2, 2009, a Physical RFC assessment of Plaintiff was completed by state agency evaluator Reynaldo M. Torio, M.D. (R. at 611 – 17). Based upon his review of the medical record, Dr. Torio concluded that the evidence supported finding impairments in the form of hepatitis C and HIV positive status. (R. at 611). Plaintiff's exertional limitations included no more than occasional lifting and carrying of fifty pounds and frequent lifting and carrying of twenty-five pounds, standing and walking no more than six hours of an eight hour day, and sitting no more than six hours. (R. at 612). Plaintiff was not otherwise limited. Dr. Torio supported this conclusion by citing to a medical record which demonstrated minimal limitations in activities of daily living, ongoing treatment with specialists, and a general lack of medical support for any other impairments. (R. at 616 – 17).

On November 1, 2010, Dennis Wayne, M.D. completed a Mental Impairment Questionnaire assessing Plaintiff's functional capacity. (R. at 689 – 99). Dr. Wayne indicated that he had been treating Plaintiff on a weekly basis since January 14, 2010. (R. at 690). No records were provided to support this statement, however. He also noted that Plaintiff's diagnoses included depressive disorder, generalized anxiety disorder, and post-traumatic stress disorder. (R. at 690). Plaintiff's global assessment of functioning ("GAF") score was 55[2]. (R. at 690). Dr. Wayne felt that Plaintiff had poor memory, sleep disturbance, mood disturbance, emotional lability, recurrent panic attacks, anhedonia or pervasive loss of interests, feelings of

---

[2]     The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 51 – 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning." *Id.*

guilt/ worthlessness, difficulty thinking or concentrating, suicidal ideation or attempts, social withdrawal or isolation, decreased energy, persistent irrational fears, and generalized persistent anxiety. (R. at 690). Plaintiff's condition had improved with treatment. (R. at 691). She had been prescribed Celexa and Clonazepam. (R. at 691). Dr. Wayne opined that Plaintiff's prognosis was "fair." (R. at 692). He believed that her mental impairments could be expected to last at least twelve months, and that "per client report," Plaintiff's depression exacerbated her physical pain. (R. at 692). Plaintiff also informed Dr. Wayne that she could not work due to the severity of her symptoms. (R. at 692, 699). As a result, he indicated that she would miss approximately three days of work per month. (R. at 692).

Dr. Wayne's specific functional limitations findings included the determination that Plaintiff would experience moderate limitation in activities of daily living, social functioning, and concentration, persistence, and pace. (R. at 693). She was noted to have experienced three episodes of decompensation of extended duration. (R. at 693). In spite of his alleged treatment history with Plaintiff, Dr. Wayne could not estimate Plaintiff's degree of limitation with respect to making occupational adjustments or making performance adjustments. (R. at 695 – 96). She had a "fair" ability to make personal-social adjustments. (R. at 696). Plaintiff could manage her benefits in her best interests. (R. at 692). Dr. Wayne could not indicate whether Plaintiff was permanently disabled, yet equivocally concluded that Plaintiff would meet the listing level requirements for receiving Social Security disability benefits under 20 C.F.R., Pt. 404, Subpt. P, App'x 1, 12.04 (Affective Disorders) and 12.06 (Anxiety Related Disorders). (R. at 699). Despite such a severe finding, he also noted that Plaintiff's mental conditions did not warrant more care than once-monthly medication checks and weekly therapy. (R. at 698).

**5. Administrative Hearing Testimony**

Plaintiff testified that she sought counseling with a therapist once per week, and received prescription Celexa and Clonazepam from Dr. Wayne for her mental health issues every three months. (R. at 36 – 37). Plaintiff suffered with constant fatigue and depression that left her unmotivated to engage in activity. (R. at 43, 45 – 46, 48). Plaintiff generally left the house only for therapy or doctors' appointments. (R. at 46 – 47). She testified that she could not even manage to make it to a daughter's graduation. (R. at 48). Plaintiff stated that she did enjoy reading and listening to music. (R. at 48 – 49). Plaintiff spent most days watching television, however. (R. at 49). Plaintiff testified that her concentration was not strong, and that she often had to write things down to avoid forgetting. (R. at 43). Plaintiff was capable of cooking, but prepared only simple meals. (R. at 40). Plaintiff primarily relied upon her husband to buy groceries. (R. at 41).

Plaintiff described experiencing extreme migraine headaches at least once a week, resulting in near incapacitation for several days. (R. at 39 – 40). Plaintiff stated that her prescription medication was occasionally helpful. (R. at 40). Plaintiff had been suffering with migraines for approximately one year. (R. at 40). Plaintiff also experienced pain in the area of her liver, which she attributed to fatty tissue and scarring. (R. at 42). Plaintiff had not yet started treatment for hepatitis C or HIV. (R. at 38 – 39). She described her sleep as erratic, as a result of mental health issues and pain. (R. at 41, 45). Plaintiff claimed that she left her last place of employment following a car accident, after which she "snapped" due to the added anxiety. (R. at 44).

Following Plaintiff's testimony, the ALJ asked the vocational expert to explain the on-task requirements for most full-time work. (R. at 52). The vocational expert responded by

explaining that an employer would expect an employee to be on task at least ninety percent of any given workday. (R. at 53). The ALJ also asked the vocational expert to characterize the nature of Plaintiff's past relevant work. (R. at 52). The vocational expert replied that Plaintiff's employment as an assistant manager in a fast food restaurant qualified as light and semi-skilled work, her work as a resident advisor was light and semi-skilled work, and her work as an assistant manager in retail was light and semi-skilled. (R. at 52). The ALJ did not pose any hypotheticals. (R. at 53). Plaintiff's attorney also had no further questions for the vocational expert. (R. at 53).

**B.    ANALYSIS**

### 1. Standard of Review

To be eligible for social security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F. 2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work,

whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24 – 25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F. 2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[3], 1383(c)(3)[4]; *Schaudeck v. Comm'r of Soc. Sec.*, 181 F. 3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. §706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart,* 312 F. 3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F. 3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401

---

[3]    Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[4]    Section 1383(c)(3) provides in pertinent part:
> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

(1971)).  If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive.  42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390.  When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered.  *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947).  The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97.  Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F. 2d 1185, 1190 – 91 (3d. Cir. 1986).

### 2. Discussion

In his decision, the ALJ found that Plaintiff experienced medically determinable severe impairment in the way of hepatitis C, asymptomatic HIV positive status, depressive and anxiety disorders, and a history of opioid and alcohol abuse, in remission.  (R. at 17).  As a result of these impairments, the ALJ concluded that Plaintiff would be capable of light exertional work, but only if simple and unskilled in nature.  (R. at 18).  The ALJ determined that in spite of these limitations, Plaintiff would be capable of returning to her past relevant work as a manager at a fast food restaurant.  (R. at 24).  The ALJ also concluded that Plaintiff would be capable of sustaining other full-time work existing in significant numbers in the national economy based upon application of the Medical-Vocational Guidelines at 20 C.F.R., Pt. 404, Subpt. P, App'x 2. (R. at 25).  Consequently, Plaintiff was found to be ineligible for DIB or SSI.  (R. at 26).

Plaintiff objects to the determination of the ALJ, arguing that he erred in his decision by failing to find Plaintiff's migraine headaches to constitute severe impairment at Step 2, by failing to find Plaintiff automatically entitled to benefits under 20 C.F.R., Pt. 404, Subpt. P, App'x 1, Listing 11.00 at Step 3, by improperly characterizing Plaintiff's employment as a fast food restaurant manager as both light and unskilled work, in clear opposition to the testimony of the vocational expert, by improperly relying upon the Medical-Vocational Guidelines to determine disabled status, because said guidelines did not take into account all of Plaintiff's limitations, and by failing to give full credit to physician findings. (ECF No. 11 at 14 – 20). Defendant counters that the ALJ properly supported his conclusions with substantial evidence, reasonably determined that Plaintiff did not suffer non-exertional limitations beyond what was listed in his RFC assessment, and properly applied the Medical-Vocational Guidelines, justifying affirmance by the Court. (ECF No. 13 at 12 – 22). The Court agrees with Defendant.

1. Migraine Headaches

Plaintiff first argues that the ALJ should have found that the medical evidence supported the existence of a severe impairment due to migraine headaches. (ECF No. 11 at 14 – 15). To bolster her contention that her migraines constituted a severe impairment at Step 2, Plaintiff cites to the medical records of Dr. McMahon which show that, beginning in October 2009, Plaintiff began to experience migraine headaches at least once per week. These headaches were allegedly debilitating, and by July 2010, were occurring three to four times per week. Dr. McMahon had consistently prescribed Sumatriptan Succinate for treatment.

"Severe" impairment is defined by regulation as "any impairment . . . which significantly limits your physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). In practice, the ALJ's analysis at Step 2 to determine whether or not an alleged

impairment is "severe," is no more than a "*de minimis* screening device to dispose of groundless claims." *Magwood v. Comm'r of Soc. Sec.*, 417 Fed. App'x 130, 132 (3d Cir. 2008) (quoting *Newell v. Comm'r of Soc. Sec.*, 347 F. 3d 541, 546 (3d Cir. 2003)). Impairment is not "severe" where the record demonstrates only "slight abnormality or a combination of slight abnormalities which have 'no more than a minimal effect on an individual's ability to work.'" *Id.* The purpose of Step 2 is merely to serve a minimal gate-keeping function, and Plaintiff's burden is not an exacting one. *McCrea v. Comm'r of Soc. Sec.*, 370 F. 3d 357, 360 (3d Cir. 2004) (citing S.S.R. 85-28, 1985 WL 56856 at *3). Reasonable doubts regarding the evidence should be construed in the light most favorable to the claimant. *Newell*, 347 F. 3d at 547.

Here, the Court agrees with Defendant that Plaintiff's migraine headaches did not constitute a "severe" impairment at Step 2. While the ALJ was incorrect in his assertion that Plaintiff was not prescribed medication typically associated with treatment of migraines, he did correctly point out that regardless of the severity of Plaintiff's complaints of pain and limitation resulting from migraines, no testing, referral to a specialist, or other treatment was prescribed by Dr. McMahon. While Plaintiff claimed to experience terrible side effects from headaches, none of her treating physicians indicated that she was limited as a result. Although Drs. Torio and Wayne assessed Plaintiff's functionality after her first complaints of migraine pain, neither doctor discussed migraines or limitations stemming therefrom. There is simply no objective evidence to support Plaintiff's subjective complaints. Further, as pointed out by Defendant, in the twelve month period between October 2009 and October 2010, Plaintiff refilled her thirty day Sumatriptan Succinate prescription only seven times. This militates against Plaintiff's contention that she experienced three or four migraines per week so severe that she was unable to function for days at a time.

Nonetheless, even if the ALJ erred in failing to find migraine headaches to be a "severe" impairment at Step 2, remand for this issue is unwarranted because it would have had no appreciable effect on the outcome of this case. *Brown v. Astrue*, 649 F. 3d 193, 195 (3d Cir. 2011). Plaintiff asserts that the ALJ should have found that her migraine headaches qualified her for disability according to 20 C.F.R., Pt. 404, Subpt. P, App'x 1, Listing 11.00, for neurological disorders. (ECF No. 11 at 16). However, Plaintiff fails to indicate for which listing she would qualify. She acknowledges that there is no listing specifically identifying migraine headaches, and fails to state why her migraines would qualify her for any other listing. As noted above, there was no objective evidence to indicate what limitations were attributable to Plaintiff's migraines. As such, there is no reason to remand for further discussion of the ALJ's decision at Step 3. Moreover, there is no reason to remand for any further discussion of Plaintiff's migraines, as it might pertain to any other part of the five step analysis by the ALJ, because Plaintiff did not identify any objective evidence of limitation stemming from her migraines – certainly none in line with the severity of the symptoms she alleged. With respect to Plaintiff's migraine headaches, the ALJ supported his decision with substantial evidence.

2. <u>Past Relevant Work and Application of the Medical-Vocational Guidelines</u>

Plaintiff next argues that the ALJ improperly determined at Step 4 that she was capable of returning to her past relevant work as a manager at a fast food restaurant because it was "unskilled and performed at the light exertional level." (ECF No. 11 at 17). Plaintiff is correct. At the administrative hearing, the vocational expert – upon whom the ALJ relied – stated that the fast food management position was "light and semi-skilled." (R. at 52). Contrary to the ALJ's assertion, Plaintiff was not eligible to return to such a position because the ALJ's RFC limited her to unskilled work. (R. at 18). This error notwithstanding, remand is not required.

Despite his Step 4 finding, the ALJ proceeded to Step 5 and determined that Plaintiff was capable of obtaining jobs existing in significant numbers in the national economy. The only non-exertional limitations that the ALJ included in his RFC assessment of Plaintiff were that she could only perform simple, unskilled work. Plaintiff asserts that such non-exertional limitations are not accounted for by the Medical-Vocational Guidelines, and that other non-exertional and exertional limitations established in the record were not included in the ALJ's RFC assessment. (ECF No. 11 at 17 – 20).

Under 20 C.F.R., Pt. 404, Subpt. P, App'x 2, the Medical-Vocational Guidelines dictate findings of disability or non-disability based upon age, educational background, strength, and skill level. If a claimant is capable of "unskilled" employment, he or she is able to perform work "which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. §§ 404.1568(a) and 416.968(a). When an RFC or hypothetical are formulated, an ALJ is seeking to approximate the extent of an individual's functional ability based upon limitations imparted by his or her impairments. It is not the impairments or diagnosed disorders that are the concern of an ALJ at Step 5, only the limitations stemming therefrom. The ALJ found Plaintiff's only non-exertional limitation to be her inability to do more than simple, unskilled work. This is taken into account by the Medical-Vocational Guidelines.

Plaintiff argues that she had additional non-exertional and exertional limitations that made the Medical-Vocational Guidelines an inadequate vehicle for determining entitlement to benefits under the Act. Plaintiff indicates that other courts have determined "depression and anxiety to be non-exertional disorders." (ECF No. 11 at 18). However, this is not relevant. It is the limitations flowing from those disorders that are dispositive. "A diagnosis of impairment, by

itself, does not establish entitlement to benefits." *Phillips v. Barnhart*, 91 F. App'x 775, 780 (3d Cir. 2004) (citing *Petition of Sullivan*, 904 F. 2d 826, 845 (3d Cir. 1990)).

Plaintiff does mention that deficits in concentration – such as those allegedly suffered by Plaintiff – are non-exertional limitations that should be accommodated by an ALJ. (ECF No. 11 at 18). However, as discussed by the ALJ, Dr. Tarter noted that Plaintiff was capable of sustaining concentration adequate to perform full-time work, and Dr. Detore's findings regarding Plaintiff's concentration did not indicate significant limitation. (R. at 22 – 24). The omission of further limitations related to concentration was not, therefore, in error. Plaintiff also directs the Court's attention to the physical limitations findings of M. Bud Lateef, M.D. on May 17, 2007. (ECF No. 11 at 19). If adopted, these findings would have required the ALJ to include further functional limitations in his RFC. It may also have required the ALJ to pose a hypothetical to the vocational expert at the administrative hearing. The ALJ did not adopt these findings, however.

An ALJ is not required to cite every *relevant* treatment note in a claimant's medical record, and is certainly not required to reference *irrelevant* evidence. *Johnson v. Comm'r of Soc. Sec.*, 529 F. 3d 198, 204 (3d Cir. 2008); *Fargnoli v. Massanari*, 247 F. 3d 34, 42 (3d Cir. 2001). Dr. Lateef's assessment of Plaintiff's functioning pre-dated her claimed disability onset date by almost two years. (R. at 302 – 03). Dr. Lateef had not treated Plaintiff since December 2006. (R. at 309). Plaintiff fails to explain why this functional assessment limiting her to no more than three hours standing and walking, and three hours sitting, in an eight hour work day, is still relevant from January 2009 onward, particularly when Plaintiff engaged in full-time work in the intervening years. The Court will not remand for discussion of Dr. Lateef's assessment, or find error in the ALJ's omission of it from his decision.

## C.    CONCLUSION

The Court finds that the ALJ provided ample justification for his disability decision to satisfy the substantial evidence requirement, and if error occurred in his analysis, it was harmless. Based upon the foregoing, the Court respectfully recommends that Plaintiff's Motion for Summary Judgment be denied, Defendant's Motion for Summary Judgment be granted, and the decision of the ALJ be affirmed. In accordance with the Magistrate Judges Act, 28 U.S.C. 636(b)(1)(B) and (C), and Rule 72.D.2 of the Local Rules of Court, the parties are allowed fourteen (14) days from the date of service of a copy of this Report and Recommendation to file objections. Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto. Failure to file timely objections will constitute a waiver of any appellate rights.

_____
Lisa Pupo Lenihan
United States Magistrate Judge

Dated: July 25, 2013
cc/ecf: All counsel of record.